NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

M. KOPPEL COMPANY, Respondent.
No. 17354.

United States Court of Appeals
Third Circuit.

Argued April 11, 1969.

Decided June 12, 1969.

Sanford Fisher, National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Laurence S. Fordham, Foley, Hoag & Eliot, Boston, Mass. (David B. Ellis, Boston, Mass., on the brief), for respondent.

Before HASTIE, Chief Judge, and KALODNER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its August 2, 1967, order [1] directing, inter alia, the respondent, M. Koppel Company (the Company) to bargain upon request with the National Organization of Industrial Trade Unions (the Union). See 29 U.S.C. § 160(e). For reasons which hereinafter appear, we deny the petition without prejudice and remand the case to the Board for further proceedings.

The Company processes and sells textile remnants at a plant in Newark and a store in Westwood, New Jersey. In 1966, Koppel was the President and Strauss, his nephew, was the Vice-President and Manager. At that time, approximately ten employees worked at the plant and two at the store.

Glassman, an organizer for the Union, gave several Union authorization cards to Thompson, an employee of the Company, on August 18.[2] Thompson distributed the cards to other employees

---

1. Reported at 166 N.L.R.B. #114.

2. Unless otherwise indicated, all dates are in 1966.

and, within four days, seven of them, including himself, had signed and returned cards to Glassman. Thereafter, under date of August 23, the Union sent a letter to the Company, stating that "a majority of your employees" had authorized it to represent them and requesting "[a]n early conference * * * for the purpose of discussing formal recognition of the Union and terms of a collective bargaining agreement". Without waiting for a reply, the Union filed the next day, August 24, a petition with the regional director of the Board, seeking certification as representative of the employees for collective bargaining purposes.[3]

Also on August 24, the letter arrived at the Company plant. However, Koppel and his wife were in Europe, having left about two weeks before on an extended vacation. Strauss responded immediately that "[o]ur Mr. Koppel, who is the head of our organization, is presently out of town, and shall not return until late September, at which time your communication will be brought to his attention". On August 25, Strauss received a copy of the representation petition. That same day, he went to the plant's sorting room and questioned the five employees he found there about the Union. Ascertaining that several of them had signed authorization cards, Strauss apparently communicated with his uncle in Europe. Thereafter, a letter arrived from the Koppels, dated August 29 and addressed to all the employees.[4] It was read to them aloud and posted on a bulletin board at the plant. On September 8, Strauss granted incremental wage increases to the four girls who worked in the sorting room.

Meanwhile, the Company was participating in the various stages of the rep-

resentation proceeding. Prehearing conferences, with representatives of the Company and the Union present, were held on August 29 and September 13. Although the Koppels returned from Europe on September 11, Glassman never demanded of Koppel that he bargain with the Union. Instead, a representation hearing was conducted on September 14 and on October 6 the regional director ordered an election.

However, the Union then withdrew its representation petition and, on October 13, filed unfair labor practice charges against the Company. A Complaint was duly issued by the General Counsel and a hearing conducted before a trial examiner. His decision held that Strauss' interrogation of the girls, the Koppels' letter, and the wage increases "interferred with, restrained, and coerced [the]. * * * employees" within the meaning of § 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1). Also, upon a finding that the Union had, by its August 23 letter, requested bargaining in an appropriate unit, he held that the Company had refused to bargain within the meaning of § 8(a) (5) of the Act. A bargaining order was recommended.[5] The Board affirmed without substantial modification and now petitions us to enforce its order.

We hold that the Company was denied procedural due process of law in the proceedings before the trial examiner and that the possibility of resulting prejudice requires a remand to the Board for the taking of additional testimony and consideration of an appropriate order in the light of the supplemented record.

Because the Union had withdrawn its representation petition and substituted the unfair labor practice charges, the trial examiner apparently regarded the

---

3. See 29 U.S.C. § 159(a) and (c). Section 159(c) provides for an election by secret ballot if "a question of representation exists."

4. The letter contained, inter alia, a request that the employees wait until the Koppels returned before undertaking to join the Union.

5. The examiner stated that even if the Union's request was inadequate to give rise to § 8(a) (5) refusal to bargain, the § 8(a) (1) violations were sufficiently severe to warrant issuing a bargaining order.

representation proceedings as irrelevant to the issues before him. This attitude manifested itself in the exclusion from evidence of both the petition and the regional director's direction of election "for all purposes", [6] as well as in the refusal to allow counsel for the Company to examine Strauss concerning the relationship between the representation proceedings and certain of his actions alleged to be unfair labor practices.

 Strauss received the Union's representation petition within a day after its letter had arrived. He was "completely surprised" such a petition had been filed, he testified, since Glassman had orally assured him the Union would await Koppel's return before taking any further action. According to Strauss, he questioned the sorting room girls in an effort to determine which employees the Union was claiming for a bargaining unit,[7] and whether it in fact had the "majority" referred to in the letter. Counsel for the Company, however, was not permitted to fully examine Strauss about his doubts as which employees were being referred to in the petition, insofar as such doubts precipitated his questioning of the girls. We think this was unfairly restrictive, in view of the fact that the trial examiner found the

questioning to have taken place before receipt of the petition [8] and concluded that Strauss' actual purpose was to "frighten [the girls] * * * into withdrawing * * * from the Union". The excluded testimony was relevant, not only to a determination of the correct sequence of these events but also to the causal relationship between them.[9]

 Also, counsel for the Company was not allowed to question Strauss about his understanding of the Union's August 23 letter in the context of the representation petition. On the record before us, this was error. An employer is under no duty to accede to an ambiguous request to bargain. National Can Corporation v. N. L. R. B., 374 F.2d 796 (7th Cir. 1967). The trial examiner stated during the hearing that "[t]he letter will have to speak for itself" and held in his decision, without discussion, that it "contain[ed] a plain request for recognition and collective bargaining". However, the letter was clearly incapable of speaking for itself. The contemporaneous filing of a representation petition was relevant to the important issue of whether the letter constituted a legally sufficient request for bargaining in an appropriate unit, such as could be the basis of a refusal to bargain. See

6. The General Counsel, however, was permitted to introduce into evidence a list of employees which the Company had submitted to the regional director in the representation proceeding.

7. The letter contained only a reference to "your employees," whereas the petition named "all production, maintenance, shipping, and receiving employees," but in the factory only.

8. The examiner stated that "the interrogation took place *before* he had even received the petition, for it [the petition] could not have been received by him until *after* he had received [the Union's] * * letter of August 23 and replied to the letter on August 24". Strauss did testify that he received the petition after he had sent off the reply letter, but there is no indication in the record that the interrogation preceded that letter, sent August 24, which appears to be basic to the examiner's conclusion. Indeed, the only clear testimony in the record as to the

correct sequence was Strauss' uncontradicted statement that he had already received the petition when he questioned the girls.

The Board compounded this confusion by stating in footnote 2 of its order and in its brief before us (p. 4) that the correct sequence could not be established from the record since there was a conflict as to the exact date of the interrogation. This misses the mark. The crucial factor is not when Strauss questioned the girls, but whether he had received the petition when he did so.

9. However, where an employer has doubts about the appropriateness of the unit requested by the Union, he should not refuse to bargain but should place the issue before the Board for resolution by it in a representation proceeding, such as was pending in this case on and after August 24. See N.L.R.B. v. Quality Markets, Inc., 387 F.2d 20, 24 (3rd Cir. 1967).

National Can Corporation v. N. L. R. B., supra, at 800–802; Flomatic Corporation, 147 N.L.R.B. 1304 (1964); Longview Furniture Company, 100 N.L.R.B. 301 (1952).[10]

The filing of the petition, however, was not the only surrounding circumstance which the trial examiner failed to take into consideration in determining whether there had been a § 8(a) (5) refusal to bargain. Strauss testified that on two occasions prior to receiving the Union's letter of August 23, Glassman had orally assured him that he would wait and discuss the Union with Koppel when he returned. Although this testimony was uncontradicted, the examiner rejected it, finding it "impossible to believe" that any assurances had been given by Glassman.[11]

■■■ Such a determination of credibility would ordinarily be entitled to our respect. See Universal Camera Corp. v. National Labor Relations Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Valley Forge Flag Company v. N. L. R. B., 364 F.2d 310 (3rd Cir. 1966). However, our respect is not justified where, as here, the examiner himself has contributed to a witness' lack of credibility by improperly restricting his testimony. Counsel for the Company was not permitted to examine Strauss regarding two additional instances of assurances received from Glassman. According to the offers of proof, Strauss would have testified that, after he received the representation petition, Glassman twice told him that the letter and petition were formalities and that he was continuing to await Koppel's return, at which time an election could be held. The disallowance of this testimony was error. See National Can Corporation v. N. L. R. B., *supra;* Flomatic Corporation, *supra;* Longview Furniture Company, *supra.* Corroborating testimony on this point was also excluded, which magnified the error since Strauss was the Company's only witness.[12] Com-

10. The petition itself, which was erroneously excluded from evidence, is particularly relevant to the Union's own conception of whether the letter served as a request for bargaining. For, although it had already dispatched the letter, the Union did not fill in this interrogatory in the petition: "Request for recognition as Bargaining Representative was made on (*Month, day, year*) and Employer declined recognition on or about (*Month, day, year*)". In this vein, a 1967 Union newsletter, describing its activities at the Company, should also have been admitted. It stated, "Mr. Glassman * * * was requested to wait until Mr. Koppel returned * * *. On this premise, Mr. Glassman acted as a gentleman, * * * and waited until Mr. Koppel returned". Compare Boeing Airplane Company, 80 N.L.R.B. #86, at p. 450 (1948).
 On the question of the appropriate unit, it has been noted that the letter ambiguously referred only to "your employees". See footnote 7, *supra.* And the representation petition claimed only the employees at the plant, whereas the regional director in his direction of election and the trial examiner in his decision both included the store personnel in the appropriate unit.

11. His reasoning was that " * * * if he had in fact obtained such an assurance, he would have accused the Union, in replying to its letter of August 23, of a breach of faith in failing to honor the supposed assurance". The disregard of uncontroverted testimony on the ground that it is inconsistent with the trial examiner's concept of what human behavior "would have" been strikes us as questionable at best. However, as indicated *infra,* there are other more compelling reasons why Strauss' testimony as to Glassman's assurances should be reconsidered on remand.
 We note that Strauss was directly impeached only once—with respect to his recollection of when he had discovered that a disputed "employee" had become pregnant and was planning to leave—and was substantially rehabilitated on redirect. The trial examiner did not base the rejection of Strauss' testimony on his impeachment as to this unrelated matter, nor, we think, would he be justified in doing so.

12. At the hearing's end, counsel for the Company offered "two witnesses" whose testimony "would be completely corroborative of the matter Mr. Strauss has testified to." The trial examiner replied, "I am not interested in what their testimony would be". Also, the Company's Motion to Reopen the Record, filed after the ex-

pare Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 225–226, 59 S.Ct. 206, 83 L.Ed. 126 (1938). The trial examiner was not entitled to refuse to credit testimony for whose limited nature his improper exclusionary rulings were responsible. Cf. Valley Forge Flag Company v. N. L. R. B., *supra.*

█ The examiner compounded this inequity in his decision by treating such of this testimony as he did allow inconsistently from other testimony in the record. As part of the Company's attack on the validity of the Union authorization cards,[13] Strauss related that Wilson, one of the seven employees who had signed cards, had told him he did so only "to be one of the gang," and because the other employees had assured him it was "just an address card". The examiner rejected this uncontradicted testimony, citing the fact that the Company

did not produce Wilson as a witness. Yet Strauss' testimony of Glassman's assurances, also uncontradicted, was rejected even though Glassman, who was present at the hearing, was not recalled by the Union to refute it.[14] We are unable to reconcile such disparate treatment of the failure of a witness to testify. Together with the trial examiner's improper restriction of Strauss' direct examination, it signifies to us the denial of an essentially fair hearing.

█ We pass finally to the question of whether the trial examiner's improper handling of the hearing and record prejudiced the Company to the extent that we should refuse enforcement of the Board's petition. Strauss' understanding of the Union's August 23 letter, in the light of the contemporaneous representation proceedings and of Glassman's oral assurances,[15] was an important factor in

---

aminer's decision but before the Board's order, offered corroborative testimony by a Company attorney as to the fourth of the occasions upon which Glassman gave assurances to Strauss. This motion was denied in the Board's order, which noted that the Company "has not shown * * that [it] * * * was denied an opportunity to introduce such evidence at the hearing".

13. We have reviewed those points in the record at which, the Company urges us, the trial examiner erroneously refused to allow examination of the employees with respect to the Union authorization cards. To the extent the questions were directed to the employees' subjective understanding of the meaning of the cards, these rulings were proper. See International Union, United A., A. & A. Imp. Wkrs. of America, A.F.L.-C.I.O. v. N.L.R.B., 124 U.S.App.D.C. 215, 363 F.2d 702, 705 (1966), cert. den. sub nom. Aero Corp. v. N.L.R.B., 385 U.S. 973, 87 S.Ct. 510, 17 L.Ed.2d 436 (1966). The title of the cards, "Application for Membership," and their legend, "I hereby authorize N.O.I. T.U. to represent me and, in my behalf, to negotiate and conclude all agreements as to hours of labor, wages and other employment conditions", are unambiguous. We do not regard the additional recital that "All information will be held strictly confidential" as necessarily controlling.

To the extent the questions at the hearing were concerned with the representations, if any, made to the employees at the time the cards were distributed, the trial examiner's rulings were erroneous. *Ibid.* However, in view of the nature of the proceedings on remand, see footnote 16, *infra,* it may appear that such error was not prejudicial.

14. Glassman was the first witness to testify at the hearing; Strauss was the last.

15. Counsel for the Board conceded in oral argument before us that Glassman had given assurances to Strauss, but maintained that they were irrelevant because the Company's conduct subsequent to receiving the Union's letter negatived any inference of refusal to bargain based on a good faith doubt.

There are two answers to this argument. In the first place, not every violation of § 8(a) (1) of the Act necessarily supports a refusal to bargain finding, see N.L.R.B. v. Quality Markets, Inc., 387 F.2d 20 (3rd Cir. 1967). The record, as supplemented on remand, may reveal that the § 8(a) (1) violations, if any, are not inconsistent with a good faith doubt on the Company's part that the Union had a genuine majority based on cards.

Secondly, a legally sufficient request for bargaining must precede a § 8(a) (5) refusal to bargain, see National Labor Relations Board v. Columbian Enameling

this case. The restrictions on his relevant testimony resulted in what we regard as a record inadequate for the proper determination of whether there had been a proper request and subsequent refusal to bargain under § 8(a)(5) of the Act. It is of no moment on such a record that evidence of unfair labor practices may be "substantial" in itself. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. Labor Bd., *supra,* 340 U.S., at 488, 71 S.Ct. at 464. If the Company were permitted to supplement the record, the additional testimony might so detract from the substantiality of the Union's case that we would be required to reach a different result in a later enforcement proceeding.

 Accordingly, the petition for enforcement will be denied. This proceeding will be remanded to the Board, with the direction that the Company be afforded an opportunity to adduce that testimony erroneously excluded.[16] Our decision is without prejudice to the Board's right to renew its petition for enforcement if, after a fair and objective appraisal of the supplemented record has been completed, its order is again in the Union's favor.

& Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939). We have indicated that an employer's understanding in the light of surrounding circumstances, of the significance of an otherwise innocuous document is relevant to whether it constitutes such a "request." Relevant also may be an employer's subsequent conduct, but we do not regard the Company's conduct in this case as sufficient to show that it could not have regarded the Union's August 23 letter other than as a request to bargain. Furthermore, we cannot say that the presence of a "request" is not an issue in this case simply because the trial examiner stated that the severity of the § 8(a)(1) violations would warrant a bargaining order even if there were a "technical flaw in the union's request." The supplemented record may justify a conclusion that any § 8(a)(1) violations are so insubstantial that a bargaining order could only be grounded on a finding

of a request and refusal to bargain under § 8(a)(5). See N.L.R.B. v. Flomatic Corporation, 347 F.2d 74 (2nd Cir. 1965); compare G.P.D., Inc. v. N.L.R.B., 406 F.2d 26 (6 Cir. 1969).

16. The Company's Application for Leave to Adduce Additional Evidence, made to us pursuant to 29 U.S.C. § 160(e), will be granted. If the evidence adduced on remand should establish that the change in identity of the Company's employees since August 1966 has been substantial, the Board should consider this in determining the propriety of issuing a bargaining order (assuming the supplemented record otherwise justifies one), as against ordering an election. See Clark's Gamble Corporation v. N.L.R.B., 407 F.2d 199 (6th Cir. 1969); N.L.R.B. v. Better Val-U Stores of Mansfield, Inc., 401 F.2d 491 (2nd Cir. 1968).